JAMES M. HAGGERTY, as Administrator of the Estate of ROBERT HANEY, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28495.)

Court of Claims, December 17, 1948.

*George F. Wenger* and *Kenneth S. MacAffer* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson* and *Frank M. Noonan* of counsel), for defendant.

LOUNSBERRY, P. J. On April 4, 1946, around one o'clock in the afternoon, Robert Haney was operating his motorcycle in a generally southerly direction along Cohoes-Waterford State Highway No. 240, Saratoga County, commonly known as Saratoga Avenue. His brother, Grover Haney, was a passenger, riding behind the operator. At some point along the curve, which begins near the Arch Street intersection and ends somewhat before the Van Der Werken Avenue intersection, the motorcycle went into a skid and crashed into the rear of an automobile parked along the right-hand side of the road in front of a gas station at the latter intersection. Robert Haney received severe injuries from which he died five days later. His administrator now makes claim against the State of New York for the decedent's death, and also for his suffering prior to death, on the ground that the State was negligent in permitting to accumulate, and to remain on the highway pavement along the area of this curve, a quantity of dirt, gravel, stones, twigs and other debris, constituting a dangerous condition and causing the skid.

Some description of the topography is essential to an understanding of the case. Saratoga Avenue has run through a built-up area for many years. In 1907 or 1908, it was paved with brick and seven-inch curbs were provided. In 1932, it was resurfaced with black-top paving, an improvement which, coupled with natural settling, had the effect of considerably reducing the curb height. The width of pavement from curb to curb is thirty-five feet.

Proceeding southerly, toward Cohoes, the highway is intersected successively by Arch Street from the right, Mohawk Avenue from the left, and Van Der Werken Avenue from the right. Beginning at the Arch Street intersection, the road makes a 20° leftward curve, with a deflection of 35° 52', for a distance of 179.3 feet, straightening out near the Mohawk Avenue intersection. The Van Der Werken Avenue intersection occurs about 170 feet farther south. The grade ascends moderately. It is a sharp and evidently deceptive curve. A warning sign, consisting of a reflectorized arrow and a " 25 MPH " notice was set about 250 feet northerly of the beginning of the curve.

In this vicinity the land to the west of Saratoga Avenue is considerably higher than the surface of the street. Arch Street

pitches toward Saratoga Avenue moderately for a distance, and then on a 10° slope for the last 75 feet. At a point 240 feet west of Saratoga Avenue, it passes under a railroad trestle. A small stream running alongside Arch Street passes under the trestle, then makes a 90° turn to the south, away from the street, and then runs easterly to Saratoga Avenue, passing under it by means of a culvert 130 feet south of the Arch Street intersection. This stream drains an area of about 250 acres, including a pond. At the point of the 90° turn, the bank has been washed out and at times of rain or other unusual water conditions a substantial part of the water, instead of pursuing the regular course to and through the culvert, proceeds on down Arch Street to Saratoga Avenue. At the time of the accident, Arch Street was not paved, and its surface was pitted and gullied by such flow of water.

There is ample evidence, not seriously disputed by the State, that at times of rain or other unusual water conditions, especially in the spring, the water draining down Arch Street onto Saratoga Avenue carried with it and deposited on Saratoga Avenue a considerable quantity of dirt, gravel, stones, twigs and other debris. Witnesses, long familiar with the area, agreed unanimously that the pavement was frequently, if not usually, littered with such material.

The State does point out that Saratoga Avenue slopes downward northerly from the Arch Street intersection rather than southerly toward the scene of the accident so that one might infer that the debris would have been carried away from rather than toward Van Der Werken Avenue. The evidence, however, is that the wheels of cars driving southerly along the area tend to pick up, carry with them, and scatter debris to the south of Arch Street. It also appears that there was some additional drainage of water and debris from the higher land and sidewalks along the west side of Saratoga Avenue to the south of the Arch Street intersection, and the State maintenance foreman adds that there was also drainage from Van Der Werken Avenue, which definitely would tend to flow northerly toward Arch Street.

There is also ample evidence that numerous prior accidents had occurred along the curve; that complaints had been made to the State, resulting in the erection of the above-mentioned " 25 MPH " sign, and also in the creation of a general thirty-five miles per hour speed zone through the area. Undoubtedly many of the accidents resulted primarily from excessive speed, but it seems fairly certain that some were caused by skidding

on the debris on the pavement. By reason of these prior accidents and the complaints made to the State officials and the fact that the maintenance crews from time to time did sweep up the debris, there is no doubt that the State had ample notice of the condition.

The drainage facilities provided by the State for this section of Saratoga Avenue consisted of the above-mentioned culvert, two drop inlets on either side of the street about 125 feet south of Arch Street, and two drop inlets on either side of the street some 500 or 600 feet north of Arch Street. Hugh T. McKee, an engineer familiar with the area experienced in highway construction, testified that such facilities were inadequate in number, size, character and location to handle the amount and type of drainage which came from Arch Street and from the area west of Saratoga Avenue generally. In particular, he stated that catch basins should have been provided at the Arch Street intersection. Daniel P. Roohan, County Assistant Engineer, who was in charge of the reconstruction of Saratoga Avenue in 1932, and who had been in charge of maintenance since that time, admitted that he had never made any study of the drainage area, and that, although he had noticed the debris on the pavement, he had never recommended or made any changes in the drainage system and had never even gone up Arch Street to investigate the cause of the difficulty. From this testimony and from the whole record, the conclusion seems inescapable that the State was negligent in failing to study the drainage situation, in failing to provide adequate drainage in the first instance, and in failing to remedy or even to attempt to remedy the situation which resulted from the lack of adequate drainage facilities. (*Taylor* v. *City of Albany*, 239 App. Div. 217, affd. 264 N. Y. 539; *Sutherland* v. *State of New York*, 189 Misc. 953.)

The evidence also tends to show that the State cleaned the pavement only infrequently. Ordinarily, Martin's crew did so only once a year, except for scattered occasions following bad storms. Other crews apparently cleaned it occasionally but the best that can be made of the testimony is that the debris was removed only a few times a year. This seems inadequate in view of the almost continuous existence of the material on the pavement and constitutes additional negligence on the part of the State.

We are further of the opinion that the signs posted by the State did not give adequate warning of the nature of the situation to be encountered. They did indicate a curve and the

necessity for restricted speed, but they gave no hint of the existence of treacherous debris on the highway. (*Sutherland v. State of New York*, 189 Misc. 953, *supra*; *Wasnick* v. *State of New York*, 183 Misc. 1073.)

With this background, the inquiry now resolves itself into the following questions:

1st: Did the condition of accumulated gravel and other debris on the highway exist on the date of the accident?

2d: Did it cause the accident?

3d: Was the operator of the motorcycle guilty of contributory negligence?

Grover Haney testified that the motorcycle was proceeding about twenty-five miles per hour, in the center of the right-hand lane; that he felt something, which he thought, although he did not actually know, was gravel, sprinkle against his legs; that the motorcycle then began slipping or skidding, and wound up in the collision. He was rendered unconscious and so could not examine the road conditions afterward. Frank Koniowka, the only other actual eyewitness, was at the Mohawk Avenue intersection, observed the motorcycle round the curve, estimated its speed at between twenty-five and thirty miles per hour, saw it skid and then strike the car. He apparently did not examine the road surface.

Chester Nourmandin, a constable, investigating on his own initiative about an hour after the accident, testified that it had rained prior to the accident and that there was gravel or small stone on the pavement between Arch Street and Van Der Werken Avenue intersection, particularly near the right-hand curve. Walter J. Burns, another constable, who investigated immediately, testified, on the other hand, that he saw nothing unusual on the pavement and that it was dry. The State maintenance foreman, William Martin, insisted that his crew had spent April 1 through April 4, 1946, cleaning and sweeping the pavement in the area; that they cleaned the west side, between Arch Street and Van Der Werken Avenue on April 2d; that there was no rain during at least the daytime on these dates. He was somewhat less definitely supported in this testimony by two laborers of his crew. He, and one of them, also testified that at the time of the accident they were working about 400 feet north of Arch Street, saw the motorcycle pass at about fifty miles per hour, and subsequently heard the crash.

Weighing this testimony, and other not specifically here alluded to, we conclude that there was in fact gravel and debris on the pavement in the vicinity of the accident. The mass of evidence to the effect that it was usually there, plus the testi-

mony of Haney and Nourmandin, outweighs in our opinion the contrary version of the State employees. Their rather extraordinary recollection of performing routine cleaning work in the particular vicinity on exact dates, based apparently on records which they failed to produce, strikes us as being a little too remarkable, and in any event it does not establish the actual condition of the area on the day of the accident, which, taking their testimony at full value, was two days after they worked on the particular section where the skid occurred.

We also conclude that the presence of the debris on the pavement did cause the accident, there being apparently no other explanation of it, unless it be excessive speed. The most definite testimony fixes the motorcycle speed at a moderate rate, within or close to the posted limit. The testimony of the State employees with respect to the speed, however accurate, can have little weight since it is based on observation at a point some 700 feet from the place of collision. Hence, the skid can scarcely have resulted from the speed of the vehicle.

By the same token, the State has failed to prove contributory negligence on the part of the decedent. The only like negligence would have been excessive speed and we have eliminated that element.

The final conclusion is, then, that the State was negligent in failing to provide adequate drainage, in failing to clean the area more regularly, and in failing to provide adequate warning; that such negligence was the cause of the accident; that the decedent was not shown to have been contributorily negligent; and that the State is therefore liable for his pain, suffering and wrongful death.

The decedent was twenty-one years of age at the time of his death, and had a life expectancy of 41.53 years. He was survived by his widow and two infant children, of the then ages of two years and of five months, respectively. He had been regularly employed, with earnings averaging approximately $171 per month for the preceding fourteen months. We award damages in the amount of $2,500 for pain and suffering and $12,500 for wrongful death, together with medical expenses of $200, hospital expenses of $43.60, and funeral expenses of $366.66, with interest on the sum of $13,110.26 from April 9, 1946, the date of death, to the date of entry of judgment.

Findings of fact and conclusions of law in accordance with this opinion may be filed within fifteen days from the date hereof, otherwise this memorandum will be considered the decision.

Judgment may be entered accordingly.